### STATE v. JOHN SMITH.

December 15, 1899.

Nos. 11,881—(22).

**Trial of Challenges to Jurors.**

*Held*, that the record shows that the defendant consented to the trial by the court of challenges to jurors for actual bias.

**Indictment for Manslaughter.**

The indictment construed as one for manslaughter in the first degree, and not for murder in the second degree. The words "wilfully killed" are not the equivalent of "with a design to effect death."

**Evidence—Results of Experiments.**

The admission in evidence of the results of experiments tending to corroborate the testimony of witnesses for the state that they saw and heard certain things from a particular position, *held* not prejudicial error, for the reasons—First, that the experiments tended to prove nothing that was not self-evident from photographs and measurements already in evidence; and, second, that an attempt had been made to impeach the witnesses by eliciting on their cross-examination facts tending to show that they could not have seen and heard what they testified to from the position which they occupied.

### Names Indorsed on Indictment—Witnesses.

The state is not required to call and examine as its witnesses all persons whose names are indorsed on the indictment. The most that was ever required, in any event, was that they be present in court, so that the defendant may call and examine them if he desires.

### Eyewitnesses in Felony Cases.

The general doctrine of the courts now is that, the reason having ceased, the old rule has ceased, that on trials for felony the prosecutor is bound to call and examine all the eyewitnesses of the res gestæ or transaction. But, without deciding this question, *held* that, in this case, the court was justified in refusing to require the state to call certain parties as witnesses, because it did not appear that they were eyewitnesses of the transaction which was the subject of investigation.

### Verdict Sustained by Evidence.

The evidence *held* sufficient to justify the verdict.

Defendant was indicted in the district court for Kittson county for manslaughter in the first degree. The case was tried before Watts, J., and a jury, and resulted in a verdict of guilty of manslaughter in the second degree. From an order denying a motion for a new trial, defendant appealed. Affirmed.

*H. Steenerson* and *E. C. Yetter*, for appellant.

*W. B. Douglas,* Attorney General, *R. R. Hedenberg,* County Attorney, and *James A. Peterson,* for the State.

MITCHELL, J.

The defendant was convicted of manslaughter in the second degree, upon the following indictment:

"John Smith is accused by the grand jury of the county of Kittson, in the state of Minnesota, by this indictment, of the crime of manslaughter in the first degree, committed as follows: The said John Smith, on the 8th day of March, A. D. 1899, at the village of St. Vincent, in the county of Kittson and state of Minnesota, did then and there wilfully, unlawfully, and feloniously, and in the heat of passion, and in a cruel and unusual manner, kill a human being, to wit: one George Bates, by then and there striking him, the said George Bates, with a blunt and dangerous weapon, a more particular description of which weapon is to the said grand jury unknown, then and thereby inflicting upon the head of him, the said George Bates, wounds, from which wounds the said George Bates died at the village of Pembina, in the county of Pembina, state of North Dakota, on the 9th of March, A. D. 1899; contrary," etc.

1. The first assignment of error is that the court erred in trying the challenge to one of the jurors for actual bias. The following is all that the record contains relating to this point:

"Ed. Chase challenged for actual bias. Challenge denied. [Then follows the examination of juror upon the cause of the challenge.] Challenge submitted. Sustained by the court."

This can admit of but one reasonable construction, viz., that no triors were appointed, and both parties consented that the challenge should be tried by the court, which may be done in cases not capital. G. S. 1894, § 7374.

2. The second assignment is that the court erred in disallowing defendant's sixth peremptory challenge. The correctness of the ruling depends upon the question whether the indictment charges manslaughter or murder in the first or second degree, they being the only two crimes in which the defendant is entitled to more than five peremptory challenges. It is not and could not be claimed that the indictment charges murder in the first degree. The only definition of murder in the second degree having any bearing on the present case is:

"Such killing of a human being is murder in the second degree, when committed with a design to effect the death of the person killed, or of another, but without deliberation and premeditation." G. S. 1894, § 6438.

Counsel's argument on this point is wholly based on the peculiar language of the indictment, which it must be admitted is not in the most approved form. They argue that "wilfully killed" means the same as "with a design to effect death." In criminal law, at least, the one is not the equivalent of the other. A man may wilfully do an act which causes death, and yet have no design to effect death.

3. The next assignment is that the court erred in overruling defendant's objection to any testimony being introduced under the indictment, "for the reason that the same did not state a public offense, and alleges an impossible charge." This is based on a mere verbal criticism on the allegations as to dates. In contemplation of law, the defendant committed the crime in this state on the 8th, although the deceased died in the state of North Dakota on the 9th,

of the month. The crime was committed in this state. State v. Gessert, 21 Minn. 369.

4. On the trial the state introduced as witnesses two young women, who on the night of the alleged homicide occupied a room in the second story of a hotel distant about 57 feet from defendant's saloon (near which the deceased received the injuries of which he died), and who testified that, on being awakened by the noise outside, they looked out of a ventilator in the storm window, and saw and heard an altercation and scuffle between two men on the sidewalk, the voice of one of whom they recognized as that of the defendant. One of the evident purposes of the cross-examination of these witnesses was to impeach their testimony by eliciting facts tending to show that they could not have seen or heard what they claimed to have done from their position at the window. There was also introduced in evidence a photograph of the locus in quo, accompanied by measurements of the distances between the various points referred to in the testimony of the young women. The state then introduced a witness who had made two experiments to ascertain how far and what points he could see from this same window, and, against the objection of the defendant, was allowed to testify as to the results, which tended to corroborate the testimony of the young women as to what they saw and heard. One of these experiments was made a few days after the alleged homicide, by looking through the ventilator in the outer or storm window, precisely as the young women testified to having done. The other was made shortly before the trial, after the storm window had been removed, and the witness raised the permanent window two or three inches, and looked and listened through the opening. The only evidence as to the result of the second experiment was that the witness distinctly recognized the defendant's voice while conversing in an ordinary tone of voice in front of his house,—a distance as great as or greater than that at which the girls testified to have heard it.

The admission of the evidence as to the results of these experiments is assigned as error. This was not prejudicial error, for at least two reasons: First. The evidence did not tend to establish any fact that was not already self-evident from the photographs and measurements in evidence. Second. The defendant had the

right to impeach the testimony of the young women by showing, as the result of experiments, that they could not have seen and heard from this window what they testified to. If he had done so, it would have been competent for the state to show by experiments that they could have seen and heard it. But it can make no difference whether the defendant attempted to impeach their evidence by actual experiments, or by other evidence tending to show that it was physically impossible for them to see what they testified to. As to the alleged change of conditions at the second experiment, it was not material as respects the testimony elicited, to wit, the distance at which defendant's voice could be recognized by one familiar with it.

5. The twelfth and thirteenth assignments of error are that the court erred in denying the defendant's motion that the state be required to call and examine Lina Brandon and Earl Jarvis, whose names were indorsed on the indictment. From the record it appears that the motion was not that the state should produce them in court, so that defendant might examine them as his witnesses, but that it should be required to examine them as its own witnesses, and the sole ground upon which the motion was based was that their names were on the back of the indictment. It is a sufficient answer to this point to say that it never was the rule that the prosecutor was bound to call all the witnesses on the back of the bill. All that was ever required, even at common law, was that he should present them in court, in order that the prisoner might examine them as his own witnesses if he desired. 1 Archbold, Crim. Pr. & Pl. 583. Although perhaps not material, it may be added that it appears that Jarvis was present, and was in fact called and examined by the defendant; also that Brandon was defendant's sister-in-law, and a member of his family.

What has been said fully disposes of the assignments of error, but in their brief counsel argue them upon another ground, to wit, that it was the bounden duty of the state to call all the eyewitnesses of the transaction or res gestæ. The old rule thus invoked had its origin at a time when a party accused of a felony was not permitted to introduce witnesses at all. Hence the justice of the rule adopted by the judges that the prosecution must introduce all

the eyewitnesses of the transaction. But now the accused has not only the right to introduce witnesses in his own behalf, but also to compulsory process, at the expense of the state, to compel their attendance. The general doctrine of the courts now is that, the reason having ceased, the rule has also ceased, and that now the state, like any other party, is permitted either to call, or to decline to call, any competent witness. So far as we can discover from a somewhat hasty examination of the authorities, Michigan seems to be the only jurisdiction holding to the contrary. As a prosecuting officer represents the public interest, and should try a case rather as a minister of justice than as a partisan, there may be circumstances where it would be wrong for him to decline to call a witness favorable to the defendant, and doubtless, in such a case, the court, on its own motion, might require the witness to be called and examined. But, without determining whether the old rule still obtains either in whole or in part, it is sufficient for the present case to say that it was nowhere made to appear that either of these parties were eyewitnesses of the transaction. Indeed, it affirmatively appears, if he is to be believed, that Jarvis was not.

6. The defendant further contends that the court erred in charging the jury that

"If the defendant, without it being necessary to defend himself, wilfully pushed the person killed off the sidewalk, or struck him and knocked him down, so that he received the injuries from which he died, it would be manslaughter in the first degree."

The court did not so charge. What he charged was that it would be manslaughter in the second degree. The only ground upon which it is claimed that the charge was erroneous is that there was no evidence upon which to base it. But this assignment of error cannot be considered, because there was no sufficient exception to the charge to raise the point. The only exception which, by any possibility, could refer to it, was, "Defendant excepts to the court's charge with reference to the degree of manslaughter."

7. The only other assignments of error worthy of consideration may be considered together, as they go to the sufficiency of the evidence to justify the verdict. We shall not attempt to do anything

more than to refer to a few of the more salient features of the evidence.

It is practically undisputed that on the afternoon of the 8th the deceased came into defendant's saloon with a sample case containing samples of cloth for men's garments, and also with two hats, which he wished to sell; that he sold one of them for a dollar to a person who was in the saloon, and traded the other to the defendant for the agreed consideration of a bottle of whiskey; that he was so intoxicated that he fell out of his chair, and lay asleep on the floor, until about 11 o'clock, when defendant aroused him, and told him that it was time to leave, as he (defendant) wished to shut up; that the deceased then requested defendant to give him his bottle of whiskey; that defendant refused to do so, giving as a reason that the deceased already had enough, and that he would give it to him some other time; that deceased then demanded the return of the hat; that, upon defendant's refusal to return it, the deceased attempted to take it by force; that thereupon the defendant ejected the deceased by force, and fastened the door behind him; that deceased refused to leave, but continued on the sidewalk in front of the saloon, pounding on the door and window, swearing and demanding his hat. This was the last that was seen of the deceased before he received the injuries of which he died.

Then followed the testimony of the two young women, already referred to, who, on being aroused by the noise on the sidewalk, got up, and looked out of the window. It was too dark for them to recognize any one by sight, or to see distinctly what occurred, but they testified to seeing the figures of two men on the sidewalk engaged in an altercation of words and in a scuffle; that they distinctly recognized the voice of one of the men as that of the defendant, with whom they were quite well acquainted; that they saw one of the men fall down and get up again, and soon fall down again, after which he did not rise. Their testimony has the air of truthfulness and probability. The next scene in the transaction disclosed by the evidence is that, shortly before 12 o'clock, Lina Brandon, the sister-in-law of defendant, and a member of his family, went over to the house of a neighbor named Hanson, and requested him to come over quick, that "Bates was nearly killed." Hanson got up, and went

over, and found the deceased lying unconscious and bleeding about in front of defendant's saloon, with his head out in the street, and his feet on the sidewalk, and his necktie and bloody collar lying within a short distance from his head. The ground was frozen and covered with snow, but there is no evidence that the surface of the street was rough, or contained any projecting objects, at the place where the deceased fell. Quite a number of the residents of the vicinity, of whom defendant was not one, soon congregated, as was natural, under the circumstances, and the result was that among them they obtained a team, and conveyed the deceased to his residence, over in Pembina, where he died that night.

All the physicians who took part in the autopsy testified that they found that deceased had sustained two fractures of the skull, and, on the same side, a fracture of the cheek bone; that, in their opinion, these injuries were caused by a blow or blows from some blunt instrument; and that these injuries caused his death. It is true that on cross-examination they testified that the injuries might have been caused by the deceased's falling from the sidewalk into the street under certain special circumstances, as, for example, if he was at the time in very rapid motion, and fell upon some hard object with very great violence. But it is evident that they admitted this as a mere possibility, and not a probability,—a fact which, in view of the severity of the injuries, would be apparent to any layman, especially where the injured person was at the time intoxicated, and consequently his muscles relaxed.

Any one accustomed to weighing evidence cannot read the record without being fully impressed with the conviction that the defendant and his family must have known more about the facts of the case than is disclosed by the evidence. Neither his wife nor his sister-in-law were called as witnesses. His own testimony was in some respects highly improbable, and on a number of material points flatly contradicted by other witnesses. He denied or evaded the trade of the hat for whiskey,—a fact which was testified to by some of his own witnesses, and is corroborated by many of the surrounding circumstances. According to his testimony, he did not at any time during the evening go out of the building after he ejected the deceased, not even to ascertain how badly he was injured, or to

78 M.—24

assist in taking care of him,—a course of conduct difficult to account for, except on the ground of a consciousness that he was in some way connected with causing the injuries. He also testified that he did not know that the deceased was seriously injured, or that his sister-in-law had gone over after Hanson, until the next morning,—a statement which, under the circumstances, is rather incredible. Other facts and circumstances might be referred to, but, without discussing the evidence further, we are satisfied that it was sufficient, even in a criminal case, to justify the verdict. This disposes of all the assignments of error of sufficient importance to be worthy of special notice.

Order denying a new trial is affirmed, and the cause remanded for judgment and sentence in accordance with the verdict.