# STATE v. A. G. JOHNSON.[1]

January 17, 1930.

No. 27,472.

[1]Reported in 228 N. W. 926.

*Will A. Blanchard* and *Robert G. Gillespie,* for appellant.

*G. A. Youngquist,* Attorney General, *William H. Gurnee,* Assistant Attorney General, and *Henry L. Soderquist,* County Attorney, for the state.

TAYLOR, C.

On September 24, 1928, the county attorney of Isanti county filed an information charging that defendant as president of the Braham State Bank had violated G. S. 1923 (1 Mason, 1927) § 5325, by withholding from the commissioner of banks information as to the condition of that bank called for by the commissioner. He was convicted and appeals from the judgment.

On April 28, 1927, under and pursuant to G. S. 1923 (2 Mason, 1927) § 7674, the commissioner of banks called for a report of the condition of the Braham State Bank at the close of business on April 25, 1927. This report, designated as exhibit B in the record, was furnished and was signed and verified by defendant as president and by Siebert J. Anderson as cashier. That it was not a correct report of the condition of the bank is conceded. It was however a correct transcript from the general ledger, but certain untrue entries had been made on that ledger.

Defendant groups his assignments of error under five general headings.

■ The Braham bank kept a deposit account in the First National Bank of Minneapolis against which it drew drafts. Defendant claims that exhibits N and Q, which were the ledger sheets of the Minneapolis bank containing this account, were received in evidence without a sufficient foundation having been laid therefor. Exhibit B, the report to the commissioner of banks, showed a deposit in the Minneapolis bank of $41,195.33. The actual deposit was $31,195.33, or $10,000 less than the amount reported. The report was taken from the general ledger of the Braham bank. The books and records of the Braham bank, other than the general ledger, seem to have been kept correctly, but the general ledger was falsified in several particulars. On April 4, 1927, the Braham bank remitted $1,203.34 to the Minneapolis bank. This remittance was correctly entered upon the books of the Braham bank and posted to the general ledger. Thereafter someone, it does not appear who, wrote the figure "1" at the left of the correct figures on the general ledger so that the amount as then appearing thereon was $11,203.34. This false credit of $10,000 was included in the report to the commissioner. After making the report two items representing liabilities were changed on the general ledger by adding $5,000 to each thereof, apparently to offset the false credit of $10,000, and in this manner the general ledger was made to balance with the other books and records of the bank so far as these items were concerned. These facts appear from the books and records of the Braham bank and the testimony of its officers and employes.

To corroborate this evidence the state called the auditor of the Minneapolis bank. He had full charge of the bookkeeping of that bank and explained in detail the system followed therein. He produced the books and records of the bank relating to the account of the Braham bank. The ledger sheets containing this account during the period in question, and the remittance letters from the Braham bank listing the items remitted, and the canceled drafts drawn by the Braham bank on the Minneapolis bank were offered and received in evidence. Defendant urges that the account was based on these remittance letters and drafts and that they were not

authenticated in any way. It may be true that there is no direct testimony that the signatures to these papers are the signatures of officers of the Braham bank, but we think they were amply authenticated. The Braham bank had the Minneapolis bank as a regular correspondent in which it kept a deposit and upon which it drew drafts. The transactions between them were conducted by mail. The Braham bank made remittances to the Minneapolis bank and drew drafts upon it almost daily. At the end of the month a copy of the account showing the remittances received and the drafts paid each day was sent by the Minneapolis bank to the Braham bank together with the canceled drafts. These remittance letters and drafts and the account of the Minneapolis bank apparently agree with the books and records of the Braham bank except as to certain entries on the general ledger of the Braham bank, which entries do not agree with and are not warranted by the other books and records of that bank. These remittances were made and these drafts drawn and paid in the regular course of business between the two banks during an extended period. It does not appear that the authenticity of any of them was ever questioned; on the contrary they appear as proper transactions in the regular course of business on the records of both banks. We see no ground for questioning their authenticity or validity. Although not particularly in point on the facts of the present case, the following are illustrations of the principles involved. Lundgren v. Union Ind. Co. 171 Minn. 122, 213 N. W. 533, 52 A. L. R. 580; Merchants Nat. Bank v. State Bank, 172 Minn. 24, 214 N. W. 750; annotation to Lundgren case in 52 A. L. R. 583; annotation in 9 A. L. R. 984.

The fact that two of the remittance letters and two drafts received during the period in question could not be found we deem unimportant as they related to comparatively small items concerning which no inaccuracy was claimed.

Although the Minneapolis bank first made a memorandum on scratch paper of remittances received and then made the entries in the books therefrom, the entries in the books are to be considered as original entries. Paine v. Sherwood, 21 Minn. 225; Webb v.

Michener, 32 Minn. 48, 19 N. W. 82; Levine v. Lancashire .Ins. Co. 66 Minn. 138, 68 N. W. 855.

■ Defendant urges that the court erred in admitting evidence tending to show that two notes held by the bank—one for $1,500 purporting to have been executed by Andrew Lundstrom, and one for $2,000 purporting to have been executed by John Tornberg— were forgeries. These notes held by the bank at the time it was closed were dated some months after the making of the report in question; but the records of the bank sufficiently show that they were renewals of prior notes purporting to have been executed by the same makers and which were included in the report as assets of the bank. Both Lundstrom and Tornberg were witnesses and not only denied their signatures to these notes but also testified that they had never executed any notes to the bank. The evidence was admissible and the rulings correct.

■ G. S. 1923 (2 Mason, 1927) § 7674, was cast in its present form by the revision of the statutes in 1905. It authorizes and directs the public examiner to call for reports from state banks and requires specified officers of the banks to make the reports so called for. L. 1909, p. 228, c. 201, created the department of banking and provides that the superintendent of banks, now known as the commissioner of banks, shall possess all the powers and perform all the duties in respect to banks theretofore possessed or performed by the public examiner. L. 1909, p. 228, c. 201, §§ 4 and 5, being G. S. 1923 (1 Mason, 1927) §§ 5323 and 5324. L. 1909, p. 228, c. 201, § 6, being G. S. 1923 (1 Mason, 1927) § 5325, is the penal provision under which the present prosecution is brought. Defendant urges that this penal provision should be held to apply only to violations of the provisions of the act of 1909. We cannot give the act such a narrow construction. It recognized the previously existing banking code, transferred the powers and duties of the public examiner in respect to banks to the superintendent of banks and enlarged the powers and duties created by the prior laws. Instead of relieving bank officials from any of the duties or obligations previously resting upon them it imposed upon them additional duties and obliga-

tions. The legislature plainly intended to continue the prior requirements in force and to add such additional requirements as it deemed necessary for the protection of the public, and that the penal provisions of the act should apply to all violations of duty made criminal thereby whether the duty was imposed by the act of 1909 or by a prior act.

■ The report on which the prosecution is based was transmitted by mail from Braham in Isanti county to the commissioner of banks at his office in the city of St. Paul in Ramsey county. Defendant claims that the offense was not committed until the report was received by the commissioner and therefore that the place of trial for the offense was in Ramsey county. This claim is untenable. The bank is located in Isanti county. Defendant resides in Isanti county, and all the acts which he committed were committed in that county. When he sent out the false report with the intention that it be delivered to and acted upon by the commissioner, without furnishing any other or different information, the offense of withholding information was complete.

"It is for his acts that defendant is responsible. They constitute his offense. The place where they are committed must be the place where his offense is committed, and therefore the place where he should be indicted and tried." State v. Gessert, 21 Minn. 369. To the same effect see State v. Smith, 78 Minn. 362, 81 N. W. 17; State ex rel. Delevan v. Justus, 85 Minn. 114, 88 N. W. 415. See also State v. Mason, 61 Kan. 102, 109, 58 P. 978.

■ Defendant sought to prove that he had never acted as an executive officer of the bank, had never taken part in the management or conduct of its business, and had no knowledge that any of the statements in the report were incorrect or untrue. The testimony offered to prove these facts and that he had no intention to deceive or mislead was excluded. This presents the serious question in the case. The vice president and the cashier had full charge of the bank and managed and conducted all its business affairs. Defendant was absent from the state during the winter preceding the making of the report. He returned April 26, 1927. The vice

president had died in March. A few days after defendant's return he joined with the cashier in signing the report which had been prepared by the cashier or under his direction ready for signature. The evidence offered was objected to and excluded on the theory that lack of knowledge that the report gave untrue information and lack of intent to furnish untrue information or to deceive or mislead constituted no defense to the charge and was immaterial. The objections and rulings were unquestionably attributable to the language of this court in State v. Sharp, 121 Minn. 381, 385, 141 N. W. 526. In that case a demurrer was interposed to an indictment under this same statute accusing Sharp as president of a bank of "withholding information," and the indictment was held sufficient although it failed to charge a criminal intent on his part specifically.

Sharp was the president of a comparatively small bank. The charge was that he "did unlawfully, wrongfully and feloniously" withhold information in that he made a report which stated the cash on hand as $9,161.59 when the true amount was only $6,161.59; which stated the amount of overdrafts as $1,977.24 when the true amount was $4,977.24; and which failed to state any notes as rediscounted when in fact notes exceeding $10,000 in amount had been rediscounted. The court as now constituted is of opinion that the decision in the Sharp case must be rested on the ground that Sharp, as an officer of the bank and the maker of the report, was presumed to know the amount of cash on hand, the amount of the overdrafts, and the fact that notes had been rediscounted. A presumption analogous to the rule that a person operating a bank is presumed to know whether he is solvent or insolvent, and that so long as he keeps it open to the public he impliedly asserts that he is solvent. Such a presumption is one of fact, not of law, and may be rebutted. State v. Quackenbush, 98 Minn. 515, 523, 108 N. W. 953.

While not questioning the result in the Sharp case, we think it adopted an erroneous construction of the statute. We do not believe that the legislature intended to punish men for not furnishing information of which they had no knowledge, where they in good

faith furnished all the information they possessed and believed and had good reason to believe that the information so furnished was true and complete. The holding in the Sharp case would permit situations in which bank officers could be subjected to penàl servitude although they had no means of knowing they were at fault, and had simply performed, honestly and in good faith, a duty exacted of them by law—a result contrary to natural justice. Under that rule a bank executive, especially in a large bank, could not sign a called report without danger of being adjudged a felon; for, however honest and capable, he could not have personal knowledge of all the transactions of the bank or of the correctness of all the entries in the books. He must necessarily rely upon the accuracy and integrity of others. To require him to make such a report, and then declare him to be a criminal if it subsequently developed that the report was incorrect because of forged paper among the assets, or of false entries in the books, of neither of which he had any knowledge, would be unjust and unreasonable. So far as we are advised none of the other states have a statute going to that extent. All that we have examined make the element of intent an ingredient of the offense. The federal statute imposes the penalty, not on the one who makes an incorrect report but on the one who made the false entries. Cochran v. U. S. 157 U. S. 286, 15 S. Ct. 628, 39 L. ed. 704.

There are many cases in which this court has held that the statute made particular acts or omissions crimes regardless of intent, but none which go to the extent that we are asked to go in this case.

We think that the legislature intended to punish deception, concealment and the failure to report known facts, not unknown and inadvertent errors; and that to withhold information within the meaning of the statute consists in knowingly, intentionally, or negligently failing to report known facts, or in knowingly, intentionally, or negligently deceiving or misleading the commissioner as to the true condition of the bank. In the printed verification on the blanks for such reports sent out by the banking department is the statement, "to the best of our knowledge and belief," indi-

cating the view of that department, and from which the signer would naturally assume that his only obligation was to give the facts as he believed them to be.

Proving the making of the report and that it was untrue established a prima facie case against the defendant, but we think he had the right to show in defense that he had no knowledge of the false entries in the books nor of the forgeries, and that he made the report in the honest belief that it was true and without any intent to conceal, mislead or deceive. The Sharp case, so far as it holds to the contrary, is overruled.

For the reason that the evidence offered by defendant in support of his defense was excluded, there must be a new trial. Judgment reversed and a new trial granted.

HILTON, J. took no part.

