J. M. PAINE & another *vs.* GEORGE W. SHERWOOD & another.

## Jan. 11, 1875.

**Effect of Pleading Counter-claim in Action for value of Goods sold.**—When, in an action to recover the value of goods sold and delivered, the defendant pleads that the goods were delivered under an express contract, and pleads a counter-claim for damages for a breach of the contract, he thereby admits the plaintiff's right to recover for the goods actually delivered; following *Mason* v. *Heyward*, 3 Minn. 182; *Paine* v. *Sherwood*, 19 Minn. 315.

**Measure of Damages on Breach of Contract to Deliver Goods to be Manufactured by Vendor.**—The rule of damages in *Hadley* v. *Baxendale*, 9 Exch. 341, and *Paine* v. *Sherwood*, 19 Minn. 315, discussed, and applied to a case where, upon the breach, by the vendor, of an executory contract for the sale and delivery of certain bridge timber, to be manufactured by him, the purchaser is unable to procure, in the condition required by the contract, the timber contracted for but not delivered, and is obliged to manufacture the same, by manual labor, at an expense much greater than the contract price. In such case, if the course pursued by the purchaser, in obtaining the timber, is the only way in which it can be obtained, or is the ordinary and usual, or is a reasonable and prudent way of obtaining it, the difference between the contract price, and the higher cost of the timber thus obtained, may be recovered by the purchaser, as damages arising naturally from the breach itself. If the course pursued by the purchaser is not the ordinary and usual, and would not be a reasonable or prudent way, were it not for an engagement into which the purchaser has entered, with a third party, for the completion, within a limited time, of the bridges for which the timber was contracted to be furnished, the purchaser cannot recover the increased cost he has been obliged to incur in order to fulfil such engagement, unless the nature of the engagement was known to the vendor at the time the contract was made. But if the nature of the purchaser's engagement to complete the bridges for which the timber was to be furnished was made known to the vendor at the time of making the contract, the purchaser may recover the difference between the contract price and the higher cost at which, acting in good faith, and with reasonable diligence and prudence, he has been obliged to obtain the kind and quantity of timber contracted for, in order to fulfil his engagement; for these damages may reasonably be supposed to have been contemplated by the parties, when making the contract, as the probable result of the breach.

15

*Evidence—Entries in Day-Book Transcribed from Temporary Memoranda.*—If it appears that the entries in a day-book were transcribed each night from temporary memoranda, the book, although supported by the oath of the person making the entries therein, is not admissible in evidence, without the testimony of the person making the provisional memoranda that at or about the time the entries in the day-book were made, articles were delivered, or work performed, of a character similar to those charged therein.

*Oath of Person Making Entries.*—It is not enough that the person making the entries in the day-book swears to all that is required by Gen. Stat., ch. 73, § 70, if, on his cross-examination, it appears that material parts of his testimony on the direct examination were merely hearsay.

Appeal by defendants from an order of the court of common pleas for Ramsey county, *Hall*, J., presiding, refusing a new trial after verdict for plaintiffs.

*E. C. Palmer*, for appellants.

*Henry J. Horn*, for respondents.

YOUNG, J.    The plaintiffs sue to recover the value of lumber and other articles sold and delivered, and of work and labor performed by them for the defendants.    After the decision of the former appeal in the action, (19 Minn. 315,) the answer was amended.    In the amended answer the defendants set forth the following contract:

" ST. PAUL, December 2, 1870.

" We agree to furnish Sherwood & Sewall with timber for three bridges on the Northern Pacific Railroad, at fourteen dollars per M., to be delivered either on the cars, or at some convenient place for framing near our mill.    Said lumber to be white pine, of good quality, full edged, and absolutely free from wane, and perfectly sound.    To be sawed of full size and length, but the size not to exceed the required dimensions more than enough to smooth it.    *    *    *    The timber on the different bills to be kept separate, and the whole delivered, if required, in five weeks, and one span in three weeks ; payable within ten days after delivery.

J. M. PAINE & CO.,

December 3, 1870.                    SHERWOOD & SEWALL."

The answer alleges that all the lumber charged in the statement of the first cause of action set forth in the complaint, amounting to 47,455 feet, and two items comprising

952 feet, were furnished under this contract, and not otherwise, and proceeds as follows : "And said defendants further allege that they forthwith required of said plaintiffs the delivery of the whole timber for said three bridges, amounting to 80,000 feet and more, as said plaintiffs then well knew, within five weeks from said December 3, 1870, and made such demand and requirement at divers times between said day and the first day of January, 1871 ; but that said plaintiffs did not deliver all said timber, required as aforesaid, within the time provided in said contract, but neglected and refused to do so, and have never delivered the same, or fulfilled said contract on their part, to the damage of said defendants as hereinafter stated, and are not entitled to maintain their said action to recover the price or value of said timber, or any part thereof, referred to herein.

" *Second.* Further answering, said defendants say that prior to entering into said contract with said plaintiffs, the defendants had contracted to and with the Northwestern Construction Company to erect and construct, in the line of said railroad, three bridges, being the same referred to in said contract with said plaintiffs ; that the amount of timber required to complete said bridges was eighty thousand feet and upwards, and said defendants were bound by their said contract with said Construction Company, to have said three bridges built and fully completed on or before March 1, 1871. That said bridges were situated on the line of said Northern Pacific Railroad, and distant from all settlements and places where such timber could be procured in a manufactured state, or sawed or squared at any mill, or any timber suitable for building the same ; and that unless said timber, and the whole thereof, could be procured and furnished under said contract by and between the parties thereto, then defendants would necessarily be put to great cost and expense in order to obtain and supply any deficiency ; that the kind and quality of timber specified in said contract was peculiar, and suitable only for the construction of the bridges specified in said contract, and not obtainable at any mill or place

within any reasonable distance from the location of said bridges, or at all, unless under said contract, or as stated herein; of all which said plaintiffs, at and prior and subsequent to the making of said contract, had due notice and knowledge; that said plaintiffs did not, though often requested so to do, furnish these defendants with timber for said three bridges sufficient to complete the same, or any timber, except about 39,000 feet, which latter quantity they furnished from time to time in the months of December, 1870, and January and February, 1871, as hereinafter stated; that they neglected and refused to furnish the balance of said timber required for said three bridges, to wit, over 40,000 feet thereof, and have never furnished the same or any part thereof, well knowing, at the time and times of their said refusal to furnish the same, that no part thereof could be procured by said defendants, except at the cost and expense, and in the manner stated herein; that the mill of said plaintiffs referred to in said contract was situated on the line of the Northern Pacific Railroad, at a place called the 'Junction,' at three miles from Thompson in Carlton county, Minnesota, and there was no other mill for sawing lumber within a distance of thirty miles from said plaintiffs' said mill, and that distance further removed from the location of said three bridges than the mill of said plaintiffs.

"And said defendants allege that said plaintiffs entered upon the performance of their said contract, and began to deliver timber thereunder, at a convenient place for framing, * * * from which the said timber, after being framed, could be loaded on the cars, and transported, over the said railroad, to the said bridge nearest said place, for erection there. That there were no other means of conveyance of the said timber; and that, unless the same was so conveyed before the breaking up of the ice in the streams over which said bridges were to be built, as stated herein, no transportation could be had for said timber to any point beyond the location of said first bridge, the distance between said bridges being about forty miles; and that it would be much

more difficult and expensive to put said timber in place in said bridges, after the ice should break up and disappear, than before ; all which was well known to said plaintiffs at all the times hereinbefore set forth."

The answer then alleges the loss of time of defendants' men employed in framing the bridges, owing to the fact that the 39,000 feet actually furnished were delivered in small quantities, and with much delay, and the damages resulting to the defendants from this loss of time, (198 days,) amounting to $545.87, are alleged as a counter-claim. As the defendants were permitted to prove this item of damage, and the jury were instructed to allow it, if proved, no question arises on this portion of the case.

The answer proceeds : " That in consequence of the failure and refusal of said plaintiffs to furnish sufficient lumber to build said three bridges, as stated herein, said defendants were compelled to seek for and procure the same elsewhere ; that they were unable to procure the same at any mill or place, in the condition required by the terms of said contract, or at all, though they made reasonable effort so to do, but were compelled to, and did, employ a great number of men, and send them into the woods adjacent to said place where said timber was being framed, to procure the necessary timber to supply said deficiency caused by said plaintiffs, as aforesaid ; and said men did so procure and cut the necessary timber for said three bridges, and hew, whipsaw and square the same by hand, at great expense of time and money to these defendants, and haul the same to the said place of framing, to be framed, in connection with said timber delivered by said plaintiffs, for use in the erection and completion of said three bridges. That said defendants were compelled to, and did, pay out and expend for the timber so procured, cut, hauled, whipsawed and squared, the sum of $1,232, which was the value of the same then and there, and which said sum these defendants set up as a counter-claim herein."

The answer concludes with an averment that, by reason

of the premises, the defendants have sustained loss and damage in the sum of $1,977.89, for which they ask judgment.

The reply admits the making of the contract, denies that any of the lumber mentioned in the complaint was furnished under the contract, except the item of "Lumber used in three bridges, 39,175 feet, $548.45," denies in detail most of the allegations in the answer, and alleges new matter not necessary to be stated here.

The court below ruled that the defendants, by pleading a counter-claim for damages arising from the plaintiffs' breach of the contract, thereby admitted the plaintiffs' right to recover for the timber furnished under the contract, although the contract was entire, and no excuse was shown by the plaintiffs for their failure to perform in full. A like ruling was made upon the former trial, and was sustained by this court, (19 Minn. 315,) on the authority of *Mason* v. *Heyward*, 3 Minn. 182, and other cases. There are grave objections to this rule, which would prevent us from adopting it, if the question were *res integra;* but after all, it is only a rule of pleading, and its practical working is not such as to occasion injustice. The benefits received by the defendant from the performance can always be given in evidence to reduce the damages claimed for the breach, and it is only in cases where the defendant's damages are less than the value of the goods furnished, or work done, under the contract, that the plaintiff can recover for part-performance of an entire contract which he has, without excuse, neglected or refused to perform in full. And the defendant can always avoid this result, and secure all his rights, by pleading the non-performance, merely as a defence to the plaintiff's action, reserving his own claim for damages to be asserted in an independent action against the plaintiff. For these reasons, we do not feel called upon to overrule the series of cases in this court in which the doctrine of *Mason* v. *Heyward* has been accepted and followed.

The averments added to the answer, by way of amend-

ment, have so far changed its character that the cause now wears an aspect quite different from that which it presented on the former appeal. Now, as then, however, the principal and important question in the case arises upon the exceptions to the rejection of testimony offered by the defendants to prove the damages sustained by them from the plaintiffs' breach of the contract.

In determining this question, it is first necessary to ascertain the rights and liabilities of the parties under this contract, and on this point there is no room for dispute. The defendants were entitled to receive, and the plaintiffs were bound to deliver, at whatever cost to themselves, the timber required for the three bridges, at the time and place, and for the price provided in the contract. If the timber could not be procured for delivery, at the time and place required by the contract, except at a cost far greater than the contract price, this circumstance would not excuse the defendants from performing their positive, express agreement. It would still be their duty to furnish the timber they had agreed to furnish. It is as well settled as anything in the law can be, that "if a party, by his contract, charge himself with an obligation possible to be performed, he must make it good, unless performance is rendered impossible by the act of God, the law, or the other party." *Dermott* v. *Jones*, 2 Wall. 1. This rule was applied in *Stees* v. *Leonard*, 20 Minn. 494, to a case of great seeming hardship to the contractors. In that case, it was held that the court could not dispense with the express terms of the contract, and that the loss must be left where the contract placed it. There is nothing in the case at bar which should except it from the operation of this wholesome rule, or which should cast upon the defendants a loss which the plaintiffs assumed by their contract, and against which they might have guarded themselves.

Such being the rights and obligations of the parties, as fixed by their contract, there is little difficulty in determining the measure of the damages which the defendants should

recover, upon a breach of the contract. " The rule of the common law is that where a party sustains a loss by reason of a breach of contract, he is, so far as money can do it, to be placed in the same situation, with respect to damages, as if the contract had been performed." *Robinson* v. *Harman,* 1 Exch. 850, 854, *per* Parke, B; *Engel* v. *Fitch,* L. R. 3 Q. B. 314, 330, *per* Cockburn, C. J.; *Brandt* v. *Bowlby,* 2 B. & Ad. 932. This rule is qualified by the rule in *Hadley* v. *Baxendale,* 9 Exch. 341, that the damages which one party to a contract ought to receive, in respect of a breach of it by the other, are such as either arise naturally, that is, in the usual course of things, from the breach itself, or such as may reasonably be supposed to have been contemplated by the parties, when making the contract, as the probable result of the breach. Of course, this rule has regard only to actual damages, with no reference to cases proper for merely nominal damages. Under the first branch of the latter rule, the proper measure of damages recoverable by the purchaser, in respect of the breach, by the vendor, of an executory contract to deliver goods at a fixed price, is the difference between the contract price and the higher market price of such goods at the time and place of delivery, " because the purchaser, having the money in his hands, can go into the market and buy." *Barron* v. *Amond,* 8 Q. B. 604, 609, *per* Tindal, C. J.; Sedgwick on Damages (6th Ed.) 313. When there is no market for the goods at the place of delivery, the value of the goods at that place is to be determined by adding to the market price of the goods, at the nearest convenient market, the cost of transportation from that market to the place named in the contract for delivery, and in some cases other items of cost. *O'Hanlan* v. *Great Western R. Co.,* 6 Best & Smith, 484; *Eaton* v. *Mellus,* 7 Gray, 566, 579.

When the goods cannot be bought in market, or there is no market within a reasonable distance, the measure of damages, under the first branch of the rule in *Hadley* v. *Baxendale,* is still the difference between the contract price

and the higher value of the goods at the place of delivery; and in the absence of any market value, the actual value must be ascertained by an investigation into what it would cost the purchaser, acting in good faith, and with due diligence and reasonable prudence, to procure, in the condition required by the contract, and delivered at the place therein named for delivery, the kind and quantity of goods contracted for. And this investigation may sometimes involve an enquiry into the cost of producing or manufacturing, at or near the place of delivery, the article contracted for. *Furlong* v. *Polleys*, 30 Me. 491; *Masterton* v. *Mayor of Brooklyn*, 7 Hill, 61; *Haskell* v. *Hunter*, 23 Mich. 305; *Taylor* v. *Read*, 4 Paige, 561.

In the case at bar, if there was no other way of procuring the timber than that pursued by the defendants, or if the way pursued by them was the ordinary and usual way, or was the most reasonable and prudent way of obtaining the timber contracted for, then the plaintiffs are bound to make good to the defendants the difference between the cost of the timber, and the contract price, for these are the damages arising naturally from the breach of the contract, and this, and no less sum, if paid at the time and place of delivery, would have enabled the defendants to procure the timber contracted for. It is not a valid objection to the application of this rule to the case supposed, that the plaintiffs may be obliged to repay to the defendants a sum greatly in excess of the contract price. The same objection would have the same weight, where the goods were purchasable in market, but the market price had risen far above the contract price; but in such case, the circumstance that the vendor could not perform his contract without heavy loss, is no excuse for non-performance, nor does it change the ordinary measure of damages. It is the vendor's duty to deliver the goods. If he refuses to do so, and the purchaser supplies himself as cheaply as may be, the vendor, being charged with the difference between the contract price, and the higher price which the purchaser has been obliged to pay, is in the same

position as if he had himself, (as was his duty,) procured and delivered the goods, receiving in payment the contract price.   Or, if the price which the purchaser, acting in good faith, and with reasonable diligence and prudence, has been obliged to pay, is higher than that at which the vendor might have procured and delivered the goods, this difference is a loss which the vendor might have escaped by performing his contract.   And in the case at bar, if,(as is alleged in the answer,) the plaintiffs owned the only mill at which the timber contracted for could be manufactured, they surely cannot be heard to complain that the timber procured by the defendants, in the only way in which the defendants could procure it, has cost more than it would have cost, had the plaintiffs themselves furnished it, as they ought to have done, but would not.

But if the defendants did not avail themselves of the ordinary and usual, but resorted to an unusual and extraordinary, mode of procuring the timber, the plaintiffs would not, in the absence of special circumstances, be liable for anything more than the difference between the contract price and the cost of the timber procured in the usual and ordinary way ; for these damages alone arise naturally from the breach of the contract.   If the course pursued by the defendants was rendered necessary by the obligation they had assumed to the Construction Company ; if in order to fulfil their engagement with that company, the defendants have been compelled to procure the timber in a manner which was not the usual and ordinary manner, and which, but for their obligations to the Construction Company, would not be a reasonable or prudent manner, they may yet be entitled to recover for this extraordinary cost, provided the case can be brought within the second branch of the rule in *Hadley* v. *Baxendale*.   These damages, though not arising naturally from the breach of contract, are yet a result of that breach, and may be recovered, if they may be reasonably supposed to have been contemplated by the parties, when making the contract, as the probable result of the breach.   The second

branch of the answer alleges that the contract with the Construction Company, the obligation which it imposed on the defendants to complete the bridges by March 1st, the importance of putting the bridges in place before the ice should break up in the spring, and the great cost to which the defendants would be put to supply any deficiency in the timber contracted for, were all matters of which the plaintiffs had notice and knowledge, before and at the time the contract was made. It may therefore be reasonably supposed, (assuming the facts to be as stated in the answer,) that the plaintiffs, when making the contract, contemplated that, in case of a breach, the defendants would be unable to procure the timber contracted for at any mill, but would be compelled to resort to a different mode of obtaining it, involving great expense, in order to fulfil their obligations to the Construction Company; and if the way in which the defendants obtained this timber was the only way in which they could obtain it in season to perform those obligations, or if this was a reasonable way of obtaining it, under all the circumstances, and in view of those obligations, (however it might be in the absence of such obligations,) then the plaintiffs may reasonably be supposed to have contemplated, as the probable result of their breach of contract, the damages alleged in the answer, and which, in their second counter-claim, the defendants seek to recover.

Having thus indicated what, in our opinion, are the rights and obligations of the parties under their contract, and to what damages the defendants would be entitled, upon proof of the facts alleged in the answer, it is unnecessary for us to take up and discuss in detail the many offers of evidence at the trial. The defendants should have been permitted to make proof of the facts alleged, on which their claim for damages was founded; and in excluding the proof offered, the court erred. In view of certain objections made by the plaintiffs' counsel, it is, however, proper to state at length one of the offers, covering the same ground as several of the others. "Defendants here offered to show, by the

witness, that they notified the plaintiffs to deliver, under the contract set up in the answer, between 70,000 and 80,000 feet of timber for the said three bridges, that being the quantity necessary for said bridges, within five weeks, as specified in said contract; that said plaintiffs neglected and refused to deliver as requested, or at all, at least 38,000 feet thereof; that said defendants thereupon endeavored to procure the said quantity from other saw-mills, but were unable to procure the same or any part thereof elsewhere, but were compelled to and did send their men into the woods adjacent to plaintiffs' saw mill, and procure the timber necessary and suitable to make up said deficiency of 38,000 feet, and hew whipsaw and square the same by hand, and haul the same to said plaintiffs' said mill, and frame the same in connection with that part of the bridge timber which said plaintiffs had furnished under said contract, and which had already been framed there, at the cost and expense for the said 38,000 feet, exclusive of framing, of $1,432, which amount was the reasonable value thereof then and there."

In view of the averments in the answer, and the evidence which had been introduced before this offer was made, we do not think it is open to the objections, "Indefinite, no foundation laid, not pleaded." J. L. Sewall, one of the defendants, had testified: "At and prior to the time of making this contract with plaintiffs, I told P. Paine of the contract we had with the Construction Company. Paine, Sherwood and myself were present. I told Paine we had undertaken to build these three bridges on the line of the Northern Pacific Railroad, and asked him if he could furnish the lumber. * * * We told him it was expected that the track should be laid over these bridges within a limited time, I think four or five weeks, and asked him if they could furnish the lumber in time, so that we could build the bridges before the track reached them. My recollection is that he could not probably furnish the lumber in so short a time as necessary. Then the time was fixed in which he could furnish the lumber, and the contract was made in ac-

cordance with his wishes as to time. We had at least two interviews with him before the contract was made. The bills of lumber were given him; his attention was called to the long lengths and different sizes of the chords, the difficulty of getting it; that it was different from ordinary lumber that was got out every day to build houses. * * * We told Paine that we desired, if possible, to complete the bridges before the track was laid; that in any event, it was necessary that they should be built during the winter." The defendant Sherwood testified substantially to the same effect. This evidence certainly tends to show that the plaintiffs, at the time of making the contract with defendants, were informed by them of their contract with the Construction Company, and that the contract in suit was made with direct reference to the contract with the company.

There was also evidence that when the contract was made, the defendants had required delivery of the timber within five weeks thereafter; that the plaintiffs had failed to comply with this demand, and had thus committed a breach of the contract; but that the parties had treated the contract as still open and subsisting, and the plaintiffs had continued to deliver, and the defendants to accept, timber in small quantities, from day to day, until March 1st. It may also be observed that, in their complaint, the plaintiffs allege that all the lumber in the first schedule annexed thereto, was furnished at the times therein set forth, and that in this schedule, the bridge timber is charged under date of March 1st, from which it may fairly be inferred that the last of the timber was delivered on that day. The breach of contract therefore took place on or about March 1st, when plaintiffs refused to furnish any more timber, and not at the end of five weeks from December 3d, as claimed by the plaintiffs' counsel.

There is, then, no ground for the objection urged against this and the other offers, "that there is no foundation for the defendants' claim for extraordinary damages; for, between January 7th and March 1st, there was abundant

time for the defendants to have obtained sawed lumber by
order or contract with other mills." The defendant Sewall
had testified that as early as February 1st, he had explained
the situation to the plaintiff J. M. Paine, at the mill; had
told him that the defendants had put up temporary bridges,
that would not stand after the ice began to break up, on
which the trains of the Northern Pacific Railroad were run-
ning; that it would take four weeks to frame the bridges,
and three or four weeks to raise them; that defendants'
men would be at the mill in a few days to begin framing;
that it would be impossible to work in the woods after the
beginning of the spring thaw; that the very latest time at
which witness would feel safe in waiting to frame bridges
would be in the latter part of February; that he repeated
the conversation as to the defendants' necessities, and the
situation they were in, several times a week during the
month of February, and continually called Paine's attention
to the plaintiffs' failure to furnish lumber fast enough to
keep defendants' men at work.

Assuming, as we must, for the purposes of this case, that
the facts were as stated by the defendants' witnesses, there
is no force in the objection that "there is nothing in the
case or pleadings showing that the defendants could not
have obtained sawed lumber from other mills, during the
period between January 7th and March 1st, and that the
defendants were not justified in waiting from January until
spring before making provision to meet the case. By so
doing they contributed to their own damage, and the plain-
tiffs should not be chargeable therewith, for they waived the
requirement of the contract as to the time of performance."

Assuming that such waiver was made, the contract was
thereby converted into a contract to furnish the timber
within a reasonable time after February 1st, and at that
time, certainly, the plaintiffs were fully advised of the
defendants' circumstances, their obligation to complete the
bridges before spring, and the necessity of completing them
before the ice broke up; and knowing these circumstances,

the plaintiffs must be taken to have contemplated, as the probable consequence of the breach of their contract, the damages which, as the defendants alleged in their answer, and offered, but were not permitted, to prove at the trial, did result, upon their refusal, on March 1st, to furnish any more timber.

The reply alleges that on or about March 1, 1871, the defendants agreed that in consideration that the plaintiffs would run their mill for two or three days, as required by the defendants, exclusively for sawing timber for the defendants, they, the defendants, would release the plaintiffs from further performance; in consideration whereof the plaintiffs ran their mill exclusively, etc., and the defendants released, etc.

The defendants' counsel makes, but does not argue the point, (numbered thirteen in his brief,) that there was no allegation or proof of any sufficient consideration for the pretended release. As the jury, by allowing the defendants' counter-claim for idle time, have, as on the former trial, found against the existence of the alleged agreement, it would be needless to pass upon the question of its validity, if proved, were it not that the same point may be made upon another trial. We are of opinion that the reply shows a sufficient consideration for the agreement, (*Munroe* v. *Perkins*, 9 Pick. 298, 305,) and the evidence of the plaintiff, J. M. Paine, tended to prove the consideration alleged.

It remains for us to consider the exceptions taken to the admission of evidence offered by the plaintiffs. Numerous entries in their books of account were offered and objected to; but from the statements in the paper book, it is not easy to ascertain what entries were received, and what rejected, nor is it clear to which of the entries received the defendants' objections were intended to apply. As to this evidence, it is sufficient to say, for the purposes of another trial, that it is not a valid objection to the entries in the plaintiffs' day-book and order book that these entries were transcribed by one of the plaintiffs or their book-keeper, on

the evening of each day, from temporary memoranda made during the day by the plaintiffs or their employees, upon shingles, loose papers, a slate or a memorandum book; but in such cases, the person who made the provisional entry on the slate, memorandum book, etc., should be called to prove that at or about the time the charges were made, articles were delivered, or work performed, of a character similar to those charged in the day-book or order book. *Kent* v. *Garvin*, 1 Gray, 148; and see *Gould* v. *Conway*, 59 Barb. 355; *Chaffee* v. *United States*, 18 Wall. 516, 541.

It is not enough that the party making the entries in the books offered swears to all that is required by Gen. Stat., ch. 73, § 70, if on his cross-examination it appears, (as in this case,) that material parts of his testimony on the direct examination were merely hearsay. In such case, it cannot be said that " all the interrogatories are satisfactorily established in the affirmative," as required by the section cited.

J. M. Paine, one of the plaintiffs, testified as to the value of certain hauling and stumpage, adding, "I did not do the hauling, and did not measure what was hauled." If, as the defendants' counsel suggests, the witness merely *guessed* at the amount stated by him, that fact could easily have been brought out on his cross-examination. For all that appears, the witness may have arrived at the amount by a mode of estimating, less exact perhaps than actual measurement, but accurate enough to warrant the submission of his testimony to the jury, to pass with them for what it was worth.

The order denying a new trial is reversed.