James SPRANGERS, et al.,
Respondents,

v.

INTERACTIVE TECHNOLOGIES, INC.,
et al., Appellants.

No. C3–85–2358.

Court of Appeals of Minnesota.

Sept. 30, 1986.
Review Denied Nov. 19, 1986.

Lawrence T. Hofmann, Robins, Zelle, Larson & Kaplan, Minneapolis, for respondents.

Gerald L. Svoboda, Fabyanske, Svoboda & Westra, Darron C. Knutson, St. Paul, for appellants.

Heard, considered and decided by LANSING, P.J., and PARKER, and NIERENGARTEN, JJ.

## OPINION

PARKER, Judge.

This case turns on whether an oral agreement or a later written document constitutes the contract between the parties; resolution of that issue determines the date of purchase of stock and how many shares of stock are owed. James Sprangers (on behalf of himself and as the agent of John Sprangers, Richard Sprangers, Daniel Freier, and Michael Verhulst, all named plaintiffs [hereinafter Sprangers]) sued Interactive Technologies, Inc. (ITI), for breach of contract for failure to deliver the full number of shares of ITI stock which he was allegedly owed. The jury awarded Sprangers the current monetary value of 427,500 shares of ITI ($1,710,000) plus punitive damages, attorney's fees and costs. ITI appealed the monetary award based on the speculative current value of the stock shares awarded, the validity of the award of punitive damages in a breach of contract case, and the jury instructions given. Sprangers has requested an award of prejudgment interest. We affirm in part, reverse in part and modify.

## FACTS

In 1980, Sprangers was a 19–year-old security guard in the Control Data building. He made the acquaintance of William Casey, at that time the president of a new and struggling company called NEAT, Inc., now known as ITI. ITI is a manufacturer of a wireless home security system which had its office in the building where Sprangers worked. Excited about ITI's prospects, Sprangers performed some clerical tasks for the company (totalling 82 hours in 1980) and became an investor.

Sprangers maintains, and the jury apparently believed, that Casey represented to Sprangers that, for a capital investment of $9,500, he could purchase 30 percent of ITI's stock. Sprangers delivered the money to ITI in two checks, of $7,500 and $2,000, on July 28 and August 1, 1980. At the time he paid for the stock, ITI apparently was not in a position to issue stock certificates, although Sprangers was told that his stock certificates were forthcoming. On August 11, 1980, the ITI board of directors held a special meeting and declared a 10–for–1 stock split for all shares issued and outstanding as of September 18, 1980. Casey subsequently asked Sprangers to sign a document titled "Letter of Agreement." This document, which has since been characterized by ITI as a loan agreement and by Sprangers as a stock purchase agreement, is reproduced below:

### LETTER OF AGREEMENT

This document constitutes a letter of agreement between National Emergency Action Team, Inc. and Jim/John Sprangers for a stock purchase/loan agreement.

Sprangers desires to purchase $9,500.00 of common stock in NEAT, Inc.

NEAT, Inc. wishes to sell $9,500.00 of common stock to Sprangers.

NEAT, Inc. is preparing a stock offering which will take the form of one of the issues outlined in the attachment. (See attachment)

The final offering is not complete, therefore, Sprangers is making a loan of $9,500.00 to NEAT, Inc. until the stock offering is finalized and the stock is issued.

The parties agree to prepare and file any necessary documents and information which may be required by the State of Minnesota as a result of entering into this agreement.

/s/James R. Sprangers  /s/William D. Casey
William D. Casey
President
Neat, Inc.

Sprangers testified that Casey showed him the document at a meeting at the end

of September or early October and asked him to sign and back-date the document to July 28, 1980 (the date of the first check Sprangers paid over to ITI). Sprangers refused to back-date the document. The document remains undated. No interest is provided for, nor is there any statement as to whether the money will be paid back and, if so, whether by cash or the delivery of stock. The document refers to "attachments" which would set out the terms of the proposed stock offering. Casey testified that the attachments dated July 30, 1980, were included. Sprangers stated that there were no attachments included.

The parties also disagree on the manner in which this document was represented. Casey contends the document was a loan agreement between Sprangers and ITI. Sprangers testified that Casey told him the document was a stock purchase agreement that was necessary "because of the way lawyers react and how they want every thing written down;" that the document, which appears to have been drafted without the aid of legal counsel, was "to keep the lawyers happy" while the company was putting the stock offering together; that Casey assured him the document would have no effect on his prior stock purchase; and that the document would not alter "the rights he had or the stock that he had purchased."

On November 13 and 14, 1980, ITI made a private stock placement of 16,000 shares. Sprangers received 1,900 new (post-split) shares for the $9,500 he paid the company in July and August and an additional 700 shares for $3,500 he paid in November. Between the July and August payment of the $9,500 and the November issuance of the stock, and unbeknownst to Sprangers, the ITI board voted a 10–to–1 stock split. This split effectively diluted respondents' investment in the company, and Sprangers received only one-tenth the number of shares of stock to which he would have been entitled had his stock purchase been effected when he paid the money. If he were found to have loaned the money to ITI, his purchase date would have been in November, and he would have been excluded from the benefit of the stock split. The split reduced Sprangers' share of the total stock ownership from 30 percent to 3 percent. Subsequent offerings have further reduced that percentage to 2.3 percent. ITI contends that a $9,500 investment was never meant to entitle Sprangers to 30 percent of the company.

## ISSUES

1. Did the trial court err in submitting Sprangers' claim as, and instructing the jury on, breach of contract rather than fraud in the inducement?

2. Did the trial court err in its jury instructions on the Minnesota Securities Act by failing to require a finding of intent?

3. Are punitive damages recoverable under Minn.Stat. ch. 80A (1984)?

4. Was the award of attorney's fees without a testimonial hearing a taking of property without due process?

5. Is the issue of prejudgment interest properly before this court?

## DISCUSSION

### I

At the heart of the dispute is the effective date of the written document (however it is characterized) and whether the prior oral agreement between Casey and Sprangers takes primacy over the written document. If the oral agreement controls, then Sprangers should receive the 30 percent of the stock, or ten times the amount he actually received. If the document is controlling, then the role of the oral agreement is, at best, an interpretive one. The court submitted the case according to Sprangers' theories of breach of contract and violation of the Minnesota Securities Act and also instructed on fraud.

ITI disputes the jury instructions and special verdict and strenuously urges that this cause of action is one for fraud in the inducement and that therefore the instruc-

tions should have included one on willful and malicious intent to defraud.

■ The central issue in this case as tried was, "what is the contract?" ITI presented a written document which appears contradictory and ambiguous on its face. We hold that it was not error for the trial court to allow Sprangers to introduce testimony to show the antecedent oral agreement to be the contract, rather than the later, ambiguous written agreement. The testimony establishing the oral contract was admissible as an exception to the parol evidence rule:

> The parol evidence rule is inapplicable to exclude evidence of fraudulent oral representations by one party which induce another to enter into a written contract.

*Johnson Building Co. v. River Bluff Development Co.*, 374 N.W.2d 187, 193 (Minn. Ct.App.1985) (citing *Hanson v. Stoerzinger*, 299 N.W.2d 401, 404 n. 4 (Minn.1980), *pet. for rev. denied*, (Minn. Nov. 18, 1985)). How to interpret that testimony was for the jury to decide:

> [W]here, as here, the language is ambiguous, resort may be had to extrinsic evidence, and construction then becomes a question of fact unless such evidence is conclusive.

*Donnay v. Boulware*, 275 Minn. 37, 44, 144 N.W.2d 711, 716 (1966) (citing *Noreen v. Park Construction Co.*, 255 Minn. 187, 96 N.W.2d 33 (1959)).

Respondents did not claim fraudulent inducement. They adduced evidence to show that Casey, acting on behalf of ITI, had Sprangers sign the letter of agreement, knowing that the company's board of directors had voted a 10–to–1 stock split, and claimed that the document was then to be used to try to prevent Sprangers from benefiting from the stock split as a stockholder of record of the "old" shares.

ITI withdrew its proposed jury instructions that dealt with damages for fraud and violations of the Minnesota Securities Act and its instructions on plaintiffs' claims about the fraudulent inducement of Sprangers' signature.

■ Sprangers sought the number of shares he would have received as an owner of "old" shares and beneficiary of the 10–to–1 split which took place between his payments for, and the issuance of, stock shares. The split was authorized at a special meeting of the board of directors in the interim. We think it is established that the stock purchase took place when the company accepted the money:

> [A] certificate is mere evidence of ownership. * * * Issuance and delivery of the stock certificate are not essential to ownership. * * * Once corporate stock is paid for, it is issued regardless of whether a stock certificate is executed and delivered.

*Golden v. Oahe Enterprises, Inc.*, 90 S.D. 263, 240 N.W.2d 102, 108 (1976) (citations omitted).

Documentary evidence presented at trial showed that ITI recorded the money received from Sprangers as payment for stock. The jury, in answering the special verdict questions, found that ITI had agreed to pay Sprangers five dollars an hour for the services he furnished to the company; that there was an oral agreement between the parties whereby Sprangers purchased 1,900 shares of stock at five dollars per share as of August 1, 1980; that ITI had breached that agreement; and that ITI had violated the Minnesota Uniform Securities Act in 1980. The jury found that 100 shares of ITI stock would fairly compensate Sprangers for the unpaid hours he had worked in 1980. The jury also found that Sprangers was entitled to 427,-500 shares of ITI (valued at four dollars per share) to compensate him for the breach of contract and violation of the Minnesota Uniform Securities Act. In addition, the jury also found that Casey had acted with willful indifference to Sprangers' rights and assessed $200,000 in punitive damages.

■ Because the jury evidently believed the "Letter" was not a loan agreement but a stock purchase agreement, the court's instructions on fraud cannot be considered erroneous. The jury could have concluded

that the fraud was Casey's failure to state the material fact of the stock split and the potential effect of the document on Sprangers' future stock ownership. The jury had previously been told that, because ITI was a corporation, it acted through its agents and was bound by their actions. The trial court did not err in submitting Sprangers' claim as a breach of contract rather than fraud in the inducement; neither the jury verdict form nor the instructions can be termed error.

## II

ITI argues that the trial court erred by failing to instruct the jury that intent is a necessary element to a showing of a violation of the Minnesota Uniform Securities Act. Minn.Stat. § 80A.01(b) (1984) provides:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly: * * * (b) to make any untrue statement of material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading * * *.

The language of Minn.Stat. § 80A.23, subd. 4 (1984), must next be applied:

No person shall be liable under subdivisions 1 to 3 who shall sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist.

Minn.Stat. § 80A.01 is nearly identical to section 101 of the Uniform Securities Act. The Official Comments to section 101 state that it is "substantially" like Rule 10b–5, 17 C.F.R. § 240.10b–5, "which in turn was modeled upon § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77(q)(a), except that [Rule 10b–5] was expanded to cover the purchase as well as the sale of any security." Rule 10b–5 speaks directly to intentional wrongdoing in its references to "any manipulative or deceptive device or contrivance" which clearly connote intentional

misconduct. 15 U.S.C. § 78j(b) (1981); *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 46 L.Ed.2d 668 (1976). However, § 17(a) of the Securities Act of 1933 was interpreted by the Supreme Court in *Aaron v. Securities and Exchange Commission,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), *not* to require scienter. In light of language traditionally used for negligence law, the application of an intent requirement was rejected. The court interpreted the language of § 17(a)(2) as "devoid of any suggestion whatsoever of a scienter requirement." *Id.* at 695, 100 S.Ct. at 1955. Therefore, as a derivative of § 17(a)(2), Minn.Stat. § 80A does not require scienter, but supports a negligence-based theory of recovery.

Other states that have addressed construction of the Uniform Securities Act have held that scienter is not a requirement under their respective versions of sections 101 and 410(a)(2) of the Uniform Securities Act. *See Rousseff v. Dean Witter & Co.,* 453 F.Supp. 774, 779 (N.D.Ind.1978) (Ind. Code § 23–2–1–19(a)(2), based on § 410(a)(2) of the Uniform Securities Act, does not require scienter); *Bradley v. Hullander,* 272 S.C. 6, 249 S.E.2d 486 (1978) (seller of stock liable for misrepresentation irrespective of scienter); *Kittilson v. Ford,* 93 Wash.2d 223, 608 P.2d 264 (1980) (scienter not required in action for fraud or misrepresentation under Securities Act).

The language of section 80A.01(b) plainly demonstrates a legislative intent to proscribe negligent conduct. The section contains no words of intent and requires only that a statement of material fact be untrue or that the omission of a material fact render a statement misleading. No jury instruction on intent was necessary.

## III

Punitive damages are not recoverable in a breach of contract cause of action, or pursuant to Minn.Stat. ch. 80A. The long-established measure of damages for breach of contract in Minnesota is:

[S]o far as money can do it, to be placed in the same situation, with respect to

damages, as if the contract had been performed.

*Paine v. Sherwood*, 21 Minn. 225, 232 (1875). In this case that would mean delivery of the stock owed due to the split. However, punitive damages may be recovered if an independent tort is also established:

> Punitive damages may be recovered if the breach of contract constitutes or is accompanied by an independent willful tort. * * * A breach of contract even if intentional, malicious or in bad faith, is not enough to convert a contract action into a tort action.

*Hay v. Dahle*, 386 N.W.2d 808, 811 (Minn. Ct.App.1986) (citing *Barr/Nelson, Inc. v. Tonto's Inc.*, 336 N.W.2d 46, 52–53 (Minn. 1983)). There being no independent tort established, punitive damages may not be awarded based on the breach of contract claim.

The Minnesota Securities Act specifies the damages recoverable for a violation:

> Damages in an action pursuant to this subdivision shall include the actual damages sustained plus interest from the date of payment or sale, costs and reasonable attorney's fees.

Minn.Stat. § 80A.23, subd. 2. Punitive damages are not specified by the Act, and the award thereof must be vacated.

### IV

■ Minn.Stat. § 80A, subd. 2, which deals with civil liabilities in securities cases, provides for "costs and reasonable attorney's fees." ITI contends that the award of attorney's fees to Sprangers was a taking of ITI's property without due process of law because no testimonial hearing was afforded them. The granting of attorney's fees is within the trial court's sound discretion:

> The district court's award of attorneys fees and disbursements is a proper exercise of its discretion within the standards established by our prior decisions.

*Amalgamated Meat Cutters, et al. v. Club 167, Inc.*, 305 Minn. 501, 502, 232 N.W.2d 103, 104 (1975). The court personally observed the quality and competence of counsel and could evaluate the amount of time and effort put into this rather complex case.

> The amount of the award is within the discretion of the trial court, but * * * the factors to be considered are: time and effort required, novelty or difficulty of the issues, skill and standing of the attorney[s], value of the interest involved, results secured at trial, * * * customary charges for similar services, and certainty of payment.

*Jadwin v. Kasal*, 318 N.W.2d 844, 848 (Minn.1982). Sprangers' attorneys provided a memorandum and an exhibit of the hours worked and a breakdown of the time spent on individual tasks. Both sides submitted affidavits on the issue to the court, and the supporting materials were made available to appellants. Having reviewed the time records of Sprangers' counsel, and having considered the risks involved for counsel who evidently took the case on a contingent basis, the trial court awarded a premium over and above the "billable" hourly charges to compensate counsel for the risks taken, the difficulty of the litigation and the result obtained. The trial court's action was within the guidelines set down by the *Jadwin* case. We may not reverse such an exercise of discretion absent a clear showing of abuse. Lack of opportunity for ITI's attorneys to cross-examine Sprangers' attorneys does not constitute a denial of due process where the issue is one for the court, and the court has sufficient evidence, by personal observation, documentary evidence and affidavits of counsel, to decide it.

### V

■ Sprangers argued in his brief and orally that the trial court erred in denying his claim for prejudgment interest under the civil liabilities section of the Minnesota Securities Act, Minn.Stat. § 80A.23, subd. 2. We cannot consider any issue not appropriately raised or retained for appeal. Because Sprangers filed no notice of review, this court does not reach the issue.

## VI

 ITI's brief makes the suggestion that if this court were to affirm, we should grant specific performance, order the stock delivered and vacate the monetary award. Sprangers' brief also suggested that, in the alternative, specific performance would be a proper remedy. At oral arguments ITI repeated its request for specific performance, rather than monetary damages, if this court affirmed. Sprangers' attorney stated that that alternative was acceptable to his clients.

The purpose of damages for breach of contract is to make the claimant whole. Specific performance is an available remedy where equity indicates its fitness. Such an order might mitigate the effect of an affirmance on the company's stability. Specific performance would obviate any question of speculation as to the stock's value.

We accept the suggestion of counsel for both ITI and Sprangers that the judgment be so modified. This court appears to have the authority to make such a modification under Minn.R.Civ.App.P. 103.04, which states:

> The appellate courts may reverse, affirm or modify the judgment or order appealed from or take any other action as the interest of justice may require.

Accordingly, we order the delivery of 427,500 shares of stock in lieu of the monetary award from the trial court. The number of shares set assumes there has been no stock split since the date of the trial court judgment.

### DECISION

1. We affirm the trial court's submission of the case as a breach of contract and find no error in the instructions or the verdict form.

2. We affirm the award of attorney's fees.

3. We vacate the monetary award of damages and order specific performance by delivery to Sprangers of 427,500 shares of stock.

4. We reverse the award of punitive damages and order it vacated.

5. We do not reach the trial court's denial of prejudgment interest.

Affirmed in part, reversed in part, modified and specific performance ordered.