# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2032

_____

Gerald L. Trooien,                                    *
                                                      *
            Plaintiff - Appellant,                    *
                                                      *    Appeal from the United States
      v.                                              *    District Court for the District
                                                      *    of Minnesota.
Peter Mansour; Barry Roitblat,                        *
                                                      *
            Defendants - Appellees.                   *

_____

Submitted: March 9, 2010
Filed: June 17, 2010

_____

Before RILEY,[1] Chief Judge, JOHN R. GIBSON and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Gerald Trooien brought this action against Peter Mansour and Barry Roitblat, former executive officers of Sproqit Technologies, Inc. (Sproqit), alleging violations of the Minnesota Securities Act (MSA), negligent and fraudulent misrepresentation, and breach of fiduciary duty, arising from Trooien's investment in Sproqit. The district court dismissed several of the securities and misrepresentation claims in Trooien's amended complaint for failure to plead with particularity, see Fed. R. Civ. P. 9(b), and granted summary judgment to Mansour and Roitblat on his remaining

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

claims, <u>see</u> Fed. R. Civ. P. 56(c).  Trooien appeals the dismissal and the adverse grant of summary judgment.  We reverse in part and affirm in part.

## I.

Sproqit was a Washington based technology start up company.  Mansour is the former president and chief executive officer of Sproqit.  Roitblat is the company's former chief technology officer.  Founded in 2000, the company's focus was developing mobile communications software for use with wireless devices.  By late 2003 Sproqit was running out of funding.  The company was still in the process of developing its software and had not yet generated any revenue.

Around this time Trooien learned that Sproqit was looking for investors.  According to Trooien's complaint, Mansour sent him a revenue forecast for Sproqit, which predicted that the company would have gross revenues of $524,224 in 2004, increasing to $8,339,360 in 2005 and $16,542,675 in 2006.  In March 2004, Trooien began funding Sproqit's monthly expenses, including payroll.  He subsequently became the company's majority shareholder, and he and his wife were appointed to the Board of Directors.

Trooien asserts that the initial revenue projections he received from Mansour, and those he received thereafter, were misleading in that they projected extremely high revenues.  He also contends that throughout his time as an investor in Sproqit, he was misled about the revenue potential of sales contracts with various firms, including those with Bell Mobility and Archos, and about the likelihood that Sproqit would be acquired by Microsoft.

Mansour regularly sent Trooien revenue projections for Sproqit.  In July 2004, Trooien received projections stating that the company was "targeting revenues of about $100k/month for the last 3 months of the year," and that starting in 2005 "they will take a huge jump."  Mansour stated that he would follow up with a much more

detailed revenue analysis. The following month, Mansour emailed revised revenue projections to Trooien, which predicted that Sproqit would receive $44,100 in monthly revenue for November 2004, increasing to $447,500 in December 2005. Mansour described the revenue projections to Trooien as a "first cut," cautioning that "[o]f course, things will change."

Trooien received another set of revenue projections from Mansour in December 2004, which lowered Sproqit's anticipated revenue for 2005 to $3,363,887. Mansour stated in his email that about $1.8 million of the anticipated revenue was to come from a contract that was "in place" with Bell Mobility. He closed his email by telling Trooien that the projections were "preliminary" and subject to the "risk that some of these deals [included in the projections] may not occur."

Trooien contacted Mansour in January 2005 to inquire as to why Sproqit was not performing as projected. Trooien expressed dissatisfaction after new revenue projections showed Sproqit failing to break even in 2004 and losing nearly $2 million in 2005. Mansour responded by email, explaining: "The last projection we sent was a draft. I think we were clear on that. Now we continue to work to be profitable by July, but I want my official projections to be conservative." Sproqit failed to meet any of its revenue forecasts. The company's revenues for 2005 were less than $100,000.

Trooien asserts that Mansour and Roitblat further misled him with respect to several of Sproqit's business deals. Mansour sent an email to Trooien in May 2005 describing a deal with Archos, a french consumer electronics company that sold devices capable of using Sproqit's software. Mansour stated in the email that "Sproqit will receive a one-time royalty of $1.50 for every device with built in wireless capability . . . that Archos sells. . . . They believe they will sell over 300k next year." Mansour also described additional Archos products that could use Sproqit software and the royalties the company would receive from the sale of those products. It later became apparent that Archos was only obligated to make payments to the company

if it elected to include Sproqit features on its products, and that Archos had elected not to do so. Trooien asserts that he was never made aware that this was the nature of the Arhos contract.

Trooien argues that he was also misled by revenue projections related to Sproqit's relationship with Bell Mobility, another manufacturer of products compatible with Sproqit software. The projections Trooien received from Mansour in December 2004 included a predicted $1,929,295 in revenue arising from the Bell Mobility relationship. Trooien later learned that the Bell Mobility contract was structured in the same way as the Archos contract, in that Bell Mobility had the option, but not the affirmative obligation, to purchase specific quantities of Sproqit's products. Trooien again asserts that he was not made aware of the nature of this contract.

In addition to the contracts with Archos and Bell Mobility, Trooien says that he was led to believe that Sproqit would be acquired by Microsoft. He contends that at some point during the summer of 2005 Mansour told him that it was an "absolute fact" that Sproqit would be acquired. In October 2005, Mansour sent Trooien an email about a meeting he had attended at Microsoft, stating,

> I met with two different groups at Microsoft today. These were very high ranking decision makers. They said they were very interested in working with Sproqit and also inquired about acquisition. I don't know where it will all go from here, but I have more meetings scheduled for later this week.

About two weeks later Mansour sent Trooien a follow up email concerning Microsoft. Mansour states in the email that he received "the green light" from the Vice President of Microsoft's mobile division and that a general manager from the same division "has the budget" for the acquisition. Mansour then states that "[w]e are not at the negotiation phase, yet" and that he will include Trooien in future meetings with Microsoft "if the meetings get bigger, and get into the negotiation phase."

-4-

In late January 2006 Mansour sent Trooien another email about Microsoft, saying "[t]hey are in.  The next step is for them to come up with a number. [A Microsoft agent] says he needs a couple of days to run a make vs. buy analysis.  He says the good news is that [another Microsoft agent] really took to my last email to him and sees the revenue value of doing the deal."  Mansour also described how Microsoft would conduct due diligence and suggested a possible offer that Sproqit could bring to the negotiations.  In February 2006 Mansour communicated to Trooien that the acquisition discussions at Microsoft appeared to be dead.  Sproqit was never acquired by Microsoft.

By late 2005 the relationship between Trooien, Mansour, and Roitblat began to deteriorate.  Trooien hired a consultant to advise him on his investment in the company with a particular focus on the possible acquisition by Microsoft.  The consultant informed Trooien that when he arrived at Sproqit's office, Roitblat and Mansour refused to give him access to any details about the company's software products.  Trooien asked another individual to contact Sproqit on his behalf in February 2006.  He asserts that Mansour and Roitblat were again uncooperative.  Trooien decided not to fund Sproqit's payroll for the month of February 2006.  Roitblat resigned on March 1, 2006, and Mansour resigned on March 6.  The remaining Sproqit employees resigned near that time as well.

Trooien subsequently filed this action against Mansour and Roitblat, alleging that they had violated § 80A.01(b) of the MSA and committed common law fraudulent and negligent misrepresentation.  Both Mansour and Roitblat moved to dismiss the complaint on the grounds that Trooien had failed to plead his claims with sufficient particularity.  The district court granted the motion but gave Trooien the opportunity to amend his complaint.  Trooien's amended complaint contained the same legal claims as the first and added a breach of fiduciary duty claim against both defendants.  Again Mansour and Roitblat moved the court to dismiss Trooien's state securities and misrepresentation claims for lack of specificity.

The district court granted Roitblat's motion in its entirety and Mansour's motion in part. The court limited Trooien's MSA and misrepresentation claims against Mansour to: (1) his statement that it "was an absolute fact that Sproqit would be acquired"; (2) his statement that there were "contracts in place" with Bell Mobility which would generate substantial revenue; and (3) his predictions of future revenue based on either (1) or (2). Trooien was also permitted to proceed on his breach of fiduciary duty claims against both Mansour and Roitblat. The defendants moved for summary judgment and the district court granted the motion, dismissing Trooien's remaining claims. Trooien challenges both the partial dismissal and the adverse grant of summary judgment.

II.

Trooien's amended complaint asserted multiple factual allegations against Mansour and Roitblat, grounded in the defendants' alleged misrepresentations about Sproqit's revenue forecasts, sales contracts, and possible Microsoft buyout. The district court dismissed all of the securities claims against Roitblat and the majority of such claims against Mansour for failure to plead with particularity. The remaining securities claims against Mansour were dismissed at summary judgment. Trooien appeals both the dismissal and the adverse grant of summary judgment.

We review de novo a district court's contested dismissal of claims, accepting as true all facts alleged in the complaint. Noble Sys. Corp. v. Alorica Central, LLC., 543 F.3d 978, 981 (8th Cir. 2008). A motion to dismiss should be granted if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." Knapp v. Hanson, 183 F.3d 786, 788 (8th Cir. 1999). We also review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. Dunning v. Bush, 536 F.3d 879, 885 (8th Cir. 2008). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Minn. Stat. § 80A.01 makes it "unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:"

> (a) to employ any device, scheme, or artifice to defraud;
> (b) to make any untrue statement of a material fact or to omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Minn. Stat. § 80A.01.[2] Trooien's claims against Mansour and Roitblat arose under § 80A.01(b). The district court dismissed the claims after concluding that § 80A.01(b) requires a showing of scienter which Trooien had failed to plead sufficiently.

Trooien challenges the basis on which the district court dismissed his securities claims, arguing that there is no scienter requirement in § 80A.01(b). Relying on Sprangers v. Interactive Technology, Inc., 394 N.W.2d 498, 503 (Minn. Ct. App. 1986), Trooien asserts that a showing of negligence is sufficient for § 80A.01(b) claims.

In Sprangers, the court of appeals determined that § 80A.01 of the securities act was modeled after § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77(q)(a), and more specifically that § 80A.01(b) was the equivalent of § 17(a)(2). Id. The court noted that the United States Supreme Court had interpreted § 17(a)(2) to require only

---

[2]Although Minn. Stat. § 80A.01 was repealed effective August 1, 2007, the statute continues to govern all actions based on conduct occurring before that date. Minn. Stat. § 80A.90(a) (2006); see also 2006 Minn. Laws ch. 196, art. 1 § 50(a).

a showing of negligence since the statutory language was "devoid of any suggestion whatsoever of a scienter requirement." Aaron v. Securities and Exchange Commission, 446 U.S. 680, 695 (1980). After taking Aaron into account, the court decided that § 80A.01(b), as a derivative of § 17(a)(2), "does not require scienter, but supports a negligence based theory of recovery." Sprangers, 394 N.W.2d at 503.

Although the Minnesota cases on § 80A.01 subsequent to Sprangers may appear at first glance to be in conflict because the subparts of the statute are not always referenced, the Minnesota Supreme Court cited to Sprangers with approval when ruling on a securities case involving an unsuitability claim. Minneapolis Employees Retirement Fund v. Allison-Williams Co., 519 N.W.2d 176, 179 (Minn. 1994) (citing Sprangers's holding that a "seller of stock may be liable for misrepresentation [under §80A.01(b)] irrespective of scienter"). That court also referenced § 80A.01(a) in Foley v. Allard, 427 N.W.2d 647, 650 (Minn. 1988) (holding that this subpart does require scienter). Sprangers is the state's most thorough analysis of § 80A.01(b) and the only Minnesota case to analyze the scienter requirement of that subpart. See Loop Corp. v. McIlroy, 2004 WL 221619 (Minn. Ct. App. Oct. 5, 2004) (unpublished) (discussing § 80A.01 generally); Fawcett v. Heimbach, 591 N.W.2d 516 (Minn. Ct. App. 1999) (discussing § 80A.01 in the context of attorney fees); Siler v. Principal Financial Sec., Inc., 2000 WL 1809048, *4 (Minn. Ct. App. Dec. 12, 2000) (unpublished) (concluding that neither §§ 80A.01(b) nor (c) require a showing of scienter).

Moreover, the Sprangers decision is consistent with the plain language of § 80A.01(b) which contains no words of intent, no reference to fraud, or deceit. Where a statute is "devoid of any suggestion whatsoever of a scienter requirement," it follows that a showing of negligence is sufficient. Aaron, 446 U.S. at 695. This conclusion is consistent with that reached by the majority of state courts to have interpreted a similarly worded state securities statute. See, e.g., Black Diamond Fund, LLLP v. Joseph, 211 P.3d 727 (Colo. App. 2009); Tanner v. State Corp. Comm'n, 574 S.E.2d

525, 530 (Va. 2003); Lehn v. Dailey, 825 A.2d 140 (Conn. App. 2003); State v. Shama Res. Ltd. P'ship, 899 P.2d 977, 982 (Idaho 1995); Joseph C. Long, Blue Sky Law § 9:136 (Nov. 2009) (collecting cases and finding the majority of state courts do not require scienter under similarly worded statutes); but see Hubbard v. Hibbard Brown & Co., 633 A.2d 345, 349 (Del. 1993).

After examining the Minnesota securities decisions starting with Sprangers, we conclude that claims arising under § 80A.01(b) require only a showing of negligence. Since the district court did not apply a negligence standard in analyzing Trooien's allegations that Mansour and Roitblat violated § 80A.01(b), we reverse the dismissal and adverse grant of summary judgment as to those claims and remand them for reconsideration under the appropriate standard.

## III.

Trooien also asserted a number of fraudulent and negligent misrepresentation claims against Mansour and Roitblat, arising from Sproqit's revenue forecasts, sales contracts, and the possible purchase by Microsoft. To succeed in a fraudulent misrepresentation claim under Minnesota law, a plaintiff must prove:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

Hoyt Props., Inc. v. Prod. Res. Group, LLC, 736 N.W.2d 313, 318 (Minn. 2007). The elements of a negligent misrepresentation claim differ from fraudulent misrepresentation only with respect to the required state of mind. In a negligent misrepresentation claim, a plaintiff must show that the defendant "supplie[d] false information for the guidance of others in their business transactions" and in doing so

"fail[ed] to exercise reasonable care or competence in obtaining or communicating the information."  Florenzano v. Olson, 387 N.W.2d 168, 174 n.3 (Minn. 1986).

The district court dismissed all misrepresentation claims against Roitblat, and dismissed the majority of such claims against Mansour, for failure to plead with particularity.  Under Minnesota law, any allegation of misrepresentation, whether labeled as a claim of fraudulent misrepresentation or negligent misrepresentation, is considered an allegation of fraud which must be pled with particularity.  Juster Steel v. Carlson Co., 366 N.W.2d 616, 618 (Minn. Ct. App. 1985).  Trooien concedes that his representation claims are subject to the pleading requirements of Rule 9(b), which requires that a pleading include "such matters as the time, place and contents of false representations."  Bennett v. Berg, 685 F.2d 1053, 1062 (8th Cir. 1982).[3]

Trooien's first set of misrepresentation claims arose from the various Sproqit revenue projections he received from Mansour.  He  asserts that Mansour and Roitblat forecast "extremely high revenues" for Sproqit, knowing the projections "to be worthless and false."  Under Minnesota law, "[f]alse promises or projections of profits can be the basis of a fraud action, but only if they are false representations of a past or present material fact."  Crowell v. Campbell Soup Co., 264 F.3d 756, 764 (8th Cir. 2001) (citing Berg v. Xerxes-Southdale Office Bldg. Co., 290 N.W.2d 612, 615 (Minn. 1980)).

In his amended complaint, Trooien repeatedly described the revenue projections he received as "arbitrary and capricious," "made with fraudulent intent," and "false and flawed."  These conclusory characterizations are not sufficient to show how the revenue projections amounted to an untrue statement of "past or present material fact."

---

[3]Trooien nonetheless argues that the district court erred by imposing a scienter requirement on his negligent misrepresentation claims.  This argument mischaracterizes the court's analysis.  The court properly assessed Trooien's negligent misrepresentation pleadings under the particularity requirements of Rule 9(b).

Id. Trooien also alleged that Mansour repeatedly told him that "significant accounts were going to be obtained" which would produce revenue. Such a general allegation does not satisfy the requirements of Rule 9(b), as it fails to specifically describe the content of Mansour's alleged misrepresentations, the time, or the place. Bennett, 685 F.2d at 1062.

The district court allowed Trooien to proceed only on those misrepresentation claims based on revenue forecasts by Mansour which were tied to Mansour's specifically alleged statements that it was an "absolute fact" that Sproqit would be acquired and that there were "contracts in place" with Bell Mobility. The remaining misrepresentation claims based on Sproqit's revenue projections were properly dismissed by the district court since they were not false statements of past or existing fact, Berg, 290 N.W.2d at 615, and were not pled with sufficient particularity, Bennett, 685 F.2d at 1062.

Trooien's second set of misrepresentation claims was based on Mansour's representations in respect to Microsoft's possible acquisition of Sproqit. According to Trooien's amended complaint, Mansour told him that Microsoft had a "green light" to acquire Sproqit and that Mansour was "very good at maneuvering within Microsoft." Trooien asserts that these statements were false statements of "past or existing material fact." Hoyt Props., 736 N.W.2d at 318. Mansour's statement that he was "very good at maneuvering within Microsoft" cannot support a misrepresentation claim under Minnesota law, however. Such a statement is merely an opinion, and is too "general and indefinite" to be a representation of fact. Martens v. Minn. Min. & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000).

Trooien's allegation concerning Mansour's "green light" statement fails under Rule 9(b) for a different reason. Minnesota law requires that a plaintiff pursuing a negligent misrepresentation claim plead particularized facts showing that the defendant "supplie[d] false information for the guidance of others in their business

-11-

transactions." Smith v. Brutger Cos., 569 N.W.2d 408, 413 n.3 (Minn. 1997). Trooien pled no particularized facts showing that Mansour supplied false information when he stated that a particular Microsoft agent had given "the green light" concerning the possible acquisition of Sproqit.

The district court allowed Trooien to proceed on his misrepresentation claim that Mansour represented to him that it was an "absolute fact" that Sproqit would be acquired by Microsoft. The remaining allegations were insufficient to satisfy the pleading requirements of Rule 9(b) and Minnesota law.

The final set of misrepresentation claims pursued by Trooien arose from Sproqit's relationship with French consumer electronics company Archos. In his amended complaint, Trooien quoted from a number of emails from Mansour. In September 2005, Mansour wrote to Trooien, "I refuse to let this thing die before I ship with Archos." In November 2005, Mansour told Trooien "we have to fulfill the Archos contract." Trooien also points to a later November 2005 email from Archos to Mansour which stated, "We have not a clear idea of whether we will need Sproqit." Trooien asserts that Mansour's statements concerning Archos were false statements of existing fact, because Archos did not have any definitive obligations under its contract with Sproqit.

The district court dismissed these misrepresentation claims for failing to satisfy Rule 9(b)'s particularity requirements. We agree that Mansour's statement that he "refuse[d] to let this thing die" cannot be characterized as an untrue statement of "past or existing fact." Berg, 290 N.W.2d at 615. Nor did Trooien sufficiently plead facts showing how Mansour's November 2005 statement was "false information." Smith, 569 N.W.2d at 413 n.3. In fact the later email from Archos to Mansour demonstrates that Archos was at that time still considering using Sproqit products, which would have required Sproqit to fulfill its contract.

-12-

Finally, the district court dismissed all misrepresentation claims against Roitblat. We agree that the claims against Roitblat fail to satisfy Rule 9(b). Trooien failed in his amended complaint to attribute any of the alleged misrepresentations to Roitblat. It is not sufficient to attribute alleged false statements to "defendants" generally. See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 550 (8th Cir. 1997)(finding pleading insufficient under Rule 9(b) where defendants were "left to guess" who was "responsible for the alleged fraud").

After the district court's dismissal order, Trooien's surviving misrepresentation claims were limited to Mansour's statement that it "was an absolute fact that Sproqit would be acquired, his statement that there were "contracts in place" with Bell Mobility, and revenue projections based on either of those statements. The court dismissed these remaining claims on summary judgment which Trooien now appeals.

Trooien's first negligent and fraudulent misrepresentation claim was based on Mansour's alleged statement that it "was an absolute fact that Sproqit would be acquired" by Microsoft. The district court determined that Trooien had "failed to provide any evidence that the 'absolute fact' statement actually occurred," noting that the statement was not mentioned in Trooien's deposition and was not included in any affidavit he submitted. On appeal Trooien asserts that the district court misread his complaint. He asserts that his amended complaint merely alleged Mansour *represented* that it was an absolute fact that Sproqit would be acquired by Microsoft, not that Mansour had used the specific words "absolute fact." Trooien argues that the complaint, deposition, and affidavits are sufficient to create a genuine issue of material fact as to whether Mansour misrepresented to him that Sproqit would be acquired.

The record indicates that Trooien did not make this clarification to the district court at either the motion to dismiss or summary judgment stage. Even if we were to accept Trooien's newly raised assertion that the district court misread his complaint,

-13-

we conclude that summary judgment was appropriate on his misrepresentation claims. Trooien has failed to present any statements or omissions of material fact to support his assertion that Mansour fraudulently represented that Sproqit would be acquired by Microsoft. Nor does the record support a conclusion that Mansour provided Trooien with "false information" as required for a negligent misrepresentation claim under Minnesota law. Smith, 569 N.W.2d at 413 n.3. To the contrary, the record indicates that Mansour repeatedly cautioned Trooien that the Microsoft deal was in the preliminary stages.

In a November 2005 email Mansour told Trooien, "we are not at the negotiation phase yet." In January 2006 Mansour emailed Trooien to say the reception was positive but that Microsoft had to conduct due diligence. The following month Mansour emailed Trooien to let him know that it appeared the acquisition discussions were dead. Considering the record and undisputed facts as a whole, Trooien failed to create a genuine issue of material fact and to show that Mansour made any false statement or supplied false information with regard to the Microsoft acquisition which would support a misrepresentation claim. Little Gem Life Sci., LLC v. Orphan Med., Inc., 537 F.3d 913, 917 (8th Cir. 2008).

Trooien's second misrepresentation claim was based on Mansour's alleged false statement that Sproqit had "contracts in place" with Bell Mobility. The district court granted summary judgment to Mansour after determining that the statement was true; Sproqit did in fact have contracts in place with Bell Mobility. Trooien concedes that a contract existed, but argues that the alleged misrepresentation relates to whether the contract would "generate substantial revenues for Sproqit." Accepting the claim as characterized by Trooien, Mansour remains entitled to summary judgment on the fraudulent misrepresentation claim against him. Trooien's allegation at best amounts to fraud by hindsight, a disputable claim. See Crowell, 264 F.3d at 764.

-14-

There is no dispute that the Bell Mobility contract resulted in revenue; the issue is about the amount predicted. When transmitting revenue forecasts to Trooien, Mansour cautioned that some deals in the forecasts, including the expected revenue from Bell Mobility, may not take place. That the contract did not produce as hoped is not an actionable claim for fraudulent misrepresentation. Id. Nor is it sufficient to support a claim of negligent misrepresentation. See Rognlien v. Carter, 443 N.W.2d 217, 220–21 (Minn. Ct. App. 1989) ("A representation or expectation as to future events is not a sufficient basis" to support a claim for misrepresentation).

Trooien's final misrepresenation claim was grounded in the revenue forecasts he received from Mansour. The revenue forecast statements do not alone amount to actionable misrepresentations under Minnesota law. It is undisputed that Mansour accompanied the various revenue forecasts sent to Trooien with disclaimers, indicating that the numbers were a "first cut," "preliminary," subject to the "risk that some of the deals [included in the projections] may not occur," and cautioning that "[o]f course, things will change." These disclaimers support the conclusion that Mansour did not make the forward looking statements with knowledge that they were false or misleading or without reasonable care. Hebrink v. Farm Bureau Life Ins. Co., 664 N.W.2d 414, 420 (Minn. Ct. App. 2003).

IV.

Trooien also brought breach of fiduciary duty claims against Mansour and Roitblat. He alleged that Mansour and Roitblat breached their fiduciary duties by causing him to continue investing money in Sproqit based on their false and misleading statements and by leaving Sproqit without taking steps to safeguard the company's assets. The district court granted summary judgment to Mansour and Roitblat on Trooien's breach of fiduciary duties claim, concluding that Trooien had failed to demonstrate that the defendants' alleged conduct rose to a breach of fiduciary duty.

Fiduciary duties of directors and shareholders are governed by the state of incorporation, Washington in this case. Dunning, 536 F.3d at 886. Under Washington law, the directors of a corporation, such as Mansour, Roitblat, and Trooien, are required to discharge their duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the director reasonably believes to be in the best interests of the corporation. Wash. Rev. Code § 23B.08.300, .420.

The Washington statute permits a corporation to limit liability for violations of the duty of care, but not for the duty of loyalty or the duty to act in good faith. See Grassmueck v. Barnett, 281 F.Supp.2d 1227, 1232–33 (W.D. Wash. 2003). Sproqit's articles of incorporation limited the liability of its directors to the fullest extent available under Washington law. Thus in order to prevail on a breach of fiduciary duty claim, Trooien must provide sufficient evidence that Mansour and Roitblat engaged in intentional conduct or knowingly violated the law, violated the duty of loyalty, or violated the duty to act in good faith. Id. at 1233.

Trooien's first argues that Mansour violated his fiduciary duties by providing him with revenue projections that "clearly had no basis in objective facts" and that Roitblat failed to correct these projections. Just as the revenue forecast allegations failed for his misrepresentation claims, they also fail here. The undisputed facts show Mansour sent several disclaimers to Trooien with the revenue projections, indicating that they were tentative and that the deals involved could change. We conclude that the revenue forecasts do not rise to an actionable claim for breach of fiduciary duties.

Trooien next argues that Mansour overstated the value of the Bell Mobility and Archos contracts and the likelihood of a Microsoft buyout and that Roitblat failed to warn him about these misstatements. The district court correctly determined that the fact these contracts were not as profitable as expected is not sufficient to demonstrate that Mansour's optimism amounted to a violation of his fiduciary duties. As a director

Trooien had the affirmative duty to be aware of Sproqit's affairs. See Senn v. Northwest Underwriters, Inc., 875 P.2d 637, 640 (Wash. Ct. App.1994). Trooien has not provided sufficient evidence to show that any of Mansour's statements in respect to Microsoft amounted to intentional misconduct or knowing violations of the law or otherwise violated Mansour's fiduciary duties.

Finally, Trooien argues that Mansour and Roitblat demonstrated bad faith over the course of their final months at Sproqit by generally failing to help with the company's transition in a way that safeguarded its assets. Trooien lacks standing to bring this claim. The injuries alleged are those to corporate assets, and a claim to recover damages for such injuries must be brought as a derivative action. See Tooley v. Donaldson, Lufkin, & Jenrette, Inc., 845 A.2d 1031, 1039 (Del. 2004).

V.

For these reasons we affirm the judgment dismissing Trooien's breach of fiduciary duty and negligent and fraudulent misrepresentation claims, but we reverse the dismissal of Trooien's state securities claims and remand them to the district court for reconsideration under the proper standard.

RILEY, Chief Judge, concurring in part and dissenting in part.

I would reverse part of the district court's dismissal of Trooien's negligent misrepresentation claim. I agree Trooien failed to plead many of his allegations of negligent misrepresentation with the particularity Fed. R. Civ. P. 9(b) requires, and thus dismissal of the lion's share of Trooien's negligent misrepresentation claim was appropriate under Fed. R. Civ. P. 12(b)(6). However, I believe in its subsequent Fed. R. Civ. P. 56 analysis the district court wrongly conflated the remaining portion of Trooien's surviving negligent misrepresentation claim with his fraudulent misrepresentation claim.

-17-

In Bonhiver v. Graff, 248 N.W.2d 291, 298-99 (Minn. 1976), the Minnesota Supreme Court adopted what is now the Restatement (Second) of Torts (Restatement) § 552 (1977) definition of negligent misrepresentation claims involving pecuniary loss. See Florenzano v. Olson, 387 N.W.2d 168, 174 n.3 (Minn. 1986). As the majority recognizes, § 552 does not require proof of scienter but instead only requires a showing that the defendant "fail[ed] to exercise reasonable care or competence in obtaining or communicating the information." Ante, at 10. The Commentary to the Restatement stresses "[w]hat is reasonable is, as in other cases of negligence, dependent upon the circumstances" and "will vary according to a good many factors." Restatement § 552 cmt. *e.* "The question is one for the jury, unless the facts are so clear as to permit only one conclusion." Id.

The district court failed to apply or even acknowledge any of the language quoted in the preceding paragraph. For example, with respect to Mansour's representation to Trooien that Sproqit had "contracts in place" with Bell Mobility, the district court merely held "the Bell Mobility statement . . . is undisputedly true, and Trooien has failed to provide a factual basis sufficient to show that any other statements about those contracts were misrepresentations." Trooien v. Mansour, Civ. No. 06-3197, 2009 WL 928325, *8 (Mar. 31, 2009). The Minnesota Supreme Court has recognized "[a] misrepresentation may be made . . . by concealing or not disclosing certain facts that render the facts that are disclosed misleading." M.H. v. Caritas Family Servs., 488 N.W.2d 282, 289 (Minn. 1992). The district court did not analyze whether this true statement, by the concealment of other material facts, rendered the statement misleading, and Mansour potentially negligent for failing to disclose the other facts. It appears the district court impermissibly subjected Trooien's negligent misrepresentation claim to the more exacting scrutiny it applied to his fraudulent misrepresentation claim.

Because the district court failed to consider Trooien's negligent misrepresentation claim under the proper standard, I would remand for

-18-

reconsideration—just as the majority properly disposes of Trooien's Minn. Stat. § 80A.01(b) claim. The district court might have reached a different conclusion had it applied the Minnesota law of negligent misrepresentation independently and completely. Cf. SEC v. Fitzgerald, 135 F. Supp. 2d 992, 1029 (N.D. Cal. 2001) (finding a defendant's failure to disclose that a contract was at best an option contract was misleading and negligent under the circumstances).

In all other respects, I concur.

_____